STRIKER *v.* KELLY, 2 Denio, 323.

In S. Ct. 7 Hill, 9.

*Assessments for Opening Streets in the city of New York ; Sale for Non-payment ; Appointment of Commissioners of Estimate, &c.; Passage of Resolution for Opening Streets by the Common Council ; How far Lease is Evidence of Regularity of Sale.*

THIS was an action of covenant brought to recover a quarter's rent alleged to be due on a lease executed by Striker to the defendant in 1839.  The defence interposed was that the greater part of the premises were sold in December, 1838, under an assessment upon them for opening the Ninth Avenue, by virtue of certain resolutions of the Common Council; that the plaintiff having neglected to pay the sum assessed thereon, the corporation in Feb. 1840 gave a lease to G. L. for 1000 years.  Evidence was given tending to show that notice to redeem was published six months before the giving of the lease, as required by the statute of 1816, and of 1840.  (Sess. L. of 1816 and 1840.)

The plaintiff insisted that the defence was invalid : 1. That the statute authorizing the corporation of the city of New York to apply for the appointment of commissioners of estimate and assessment was void, inasmuch as it conferred upon the justices of the Supreme Court a distinct and additional " office or public trust" contrary to the constitution. 2. That it was contrary to the article of the constitution which forbids the " taking of private property for public use, without making just compensation."   3. That the resolution for opening the Ninth Avenue was not passed by *ayes* and *noes.*   4. That there was no evidence of any *demand* made by the collector before the sale, nor of any affidavit of such demand, as required by the act of April, 1816.   5. That there was no evidence of the publication of the notice to redeem in the state paper.   6. That the regularity of the sale in other respects was not sufficiently proved.

The circuit judge charged against all these objections and the plaintiff's counsel excepted.  The jury, by consent of

parties found a verdict for the plaintiff for $34 13 subject to the opinion of the court.

The Supreme Court (Bronson, J. dissenting on several grounds,) decided:

1. That the statute authorizing the Supreme Court to appoint commissioners of estimate and assessment and to order the confirmation of their reports, is not incompatible with that part of the constitution of the state which prohibits the "*justices*" of the court from holding "any other office or public trust." (Bronson, J. dissenting.)

2. That the power conferred by it on the corporation to sell real estate in order to pay an *assessment for benefit* does not conflict with the constitutional provision which prohibits the taking of private property for public use without just compensation.

3. That in appointing commissioners, and in confirming their reports, the court exercises a special and limited authority; and the party seeking to avail himself of its proceedings must show the facts necessary to confer jurisdiction; that its powers in these respects, though derived from and limited by the statute, are *judicial* in their character; and that for the purpose of giving the court jurisdiction, it was necessary to prove among other things that the corporation of New York had decided to open the Ninth Avenue, *before* presenting their petition to the court for the appointment of commissioners: That the fact was sufficiently established at the trial, provided the resolution was properly adopted by the common council. That the objection to it, that it was passed in violation of the act of April 7th, 1830, without calling the *ayes and noes*, was not valid, as that provision should be construed as *directory* merely; and the *form* and *manner* of the passage of the resolution were not essential.

Bronson, J. dissented strongly from this decision.

4. That the rule that a party claiming title under a sale by authority of a municipal corporation for taxes or assessments must show all the facts necessary to prove the sale legal and regular, had been modified by the act of 1816, the *lease* being declared conclusive evidence of the regularity of the sale; and that such lease is evidence not only that the corporation duly advertised, &c., but that the collector had

previously demanded payment of the assessment, and made the affidavit required by the statute. (Bronson, J. dissented also from this part of the decision.)

The court held, however, that the lease is no evidence of the due publication of the notice to redeem.

---

*Beardsley*, J., who delivered the opinion of the majority, makes use of the following *observations* upon the objection that by the proceedings in this case, private property would be taken for public use, without making just compensation. We give them at large, as we propose to notice the question hereafter, in connection with the two authorities he has cited in support of his views. He says:

"It was objected that by these proceedings, private property would be taken for public use, without making just compensation, which is forbidden by the constitution. (Art. 7, § 7.) But no property belonging to the plaintiff was taken directly for the use of the public. This land does not even adjoin the avenue to be opened. Upon the *assumption that the opening* of this avenue would enhance the *value of his property*, a charge was imposed upon it to pay a part of the expenses thus incurred. This was *local taxation* for a *local purpose, and falls within the legitimate exercise of the taxing power*. (*Livingston* v. *The Mayor, &c. of New York,* 8 Wend. 101. *Beekman* v. *The Saratoga & Schenectady R. R. Co.,* 3 Paige, 45.) In towns, individuals are taxed to make and repair the town highways, and in cities to grade and pave streets. Each town has its local tax for town expenses, as has also each county to meet county charges. These are all *modifications* of the *taxing power*, and quite as obnoxious to the constitutional objection raised, as is the assessment of lands *benefitted* by the opening of a street, to meet the charge of such an improvement." p. 23, 24.

---

The Supreme Court having given judgment for the defendant, the plaintiff brought his writ of error to this court.

The Court of Errors reversed the judgment of the Supreme Court. Porter, senator; Gardiner, president; senators Lester and Lott, delivered written opinions in favor of reversal.

Porter, senator, held that the statutes which confer upon the judges of the Supreme Court the powers in question give them another "office or public trust" than that of judges of that court; and in this respect violated the constitution and was void. He held also that the act, being "in derogation of the common law right of the owner, and to be construed strictly, no sale could take place until the *affidavit* of the collector had been made. The affidavit is made as necessary as the assessment. The statute has made it a condition upon which the corporation may proceed to *sell*; and the courts have no power to dispense with it. It is no answer that the act has declared that the lease shall be conclusive evidence that the *sale* was regular. It is not the regularity of the proceedings *at the sale* or immediately connected with the *act of selling*, that is sought to be impeached. The foundation of the right to sell at all, however regular the sale, has not been shown by the proof."

With this latter view the president and senators above named concurred; though dissenting from the first ground. The judgment of the Supreme Court was accordingly reversed—16 to 1.

The following resolution was then proposed and adopted.

"*Resolved*, That the making of the affidavit by the collector as required by the act of 12th April, 1816, for the more effectual collection of taxes and assessments in the city of New York, is an essential part of the power to sell for assessments or taxes under the provisions of that act; and that the lease given by the corporation is not evidence that such an affidavit has been made so as to support the sale, without proof of the making of such affidavit *before* the premises were advertised for sale."

On the question of adopting this resolution all the members of the court present (14) voted in the affirmative, and it was accordingly adopted as the ground of reversing the judgment of the court below.

_____

☞ The principle embodied in this resolution seems so clear and unquestionable that it is difficult to conceive how it should ever have been successfully contested in the Supreme Court. The case of *Jackson* ex d. *Clark* v. *Morse*,

18 J. R. 441, is founded on the same general principles, both as to the authority of the comptroller to sell for taxes, and the evidence of the fact authorizing the sale.

With respect to the other ground of reversal urged by Mr. Senator Porter, and on which Mr. Justice Bronson had dissented from the majority of the Supreme Court, viz: that the authority conferred on the judges of that court was incompatible with the constitution, as conferring a distinct " office or public trust," it is not our design to enter into any discussion. Whether incompatible with that clause of the constitution or not, there can be no doubt that it is wholly incompatible with every thing like a judicial proceeding, as understood in a legal sense. On grounds of expediency, it is very doubtful if the powers exercised by them, could be vested in any depository less fitted to act as street commissioners in adjusting the claims and regulating the assessments for opening and widening streets in the city of New York. The consequence has been what might naturally have been expected; that cases of the grossest abuse, of the most cruel individual hardship and oppression have gone unredressed and virtually unheard. But that is a subject as foreign to the constitutional powers of the court as to the other ground of reversal.

There is, however, another constitutional objection raised in the case of *Striker* v. *Kelly*, in the Supreme Court, upon which the Court of Errors did not pass, but which was adjudicated upon and briefly discussed in the opinion of Mr. Justice Beardsley. (See the extract from his opinion, ante, p. 444.) It was objected in that court that this " *assessment for benefit*" was contrary to that provision of the constitution of 1821, which declared that " private property shall not be taken for public use without just compensation." In the examination the learned judge bestows upon this question, there are three propositions, rather assumed than discussed, which require to be carefully considered in arriving at a correct conclusion. He says then: 1. That by the assessment on the land of the plaintiff for the *benefit* to be derived from opening the avenue, no *property* belonging to the plaintiff was taken for the use of the public. 2. That the *charge* thus imposed upon his land was on the *assumption* that the opening

of this avenue would enhance the value of his property, and, 3. That this was a *local taxation* for a *local purpose* and falls within the legitimate exercise of the *taxing* power."

Before treating of these in detail, a glance at the nature and extent of this power of taking private property for public use will be useful, as it is established by the public law of civilized nations; with the limits the publicists and jurists assign to it. Those are a part of the law of our land, paramount to all written state or national constitutions. The power is derived solely from the right of *eminent domain*, residing in the society or sovereign, or that portion of the government exercising supreme authority.

The right of *eminent domain* is thus defined by Vattel: "The right which belongs to the society or the sovereign of disposing, in case of necessity and for the public safety, of all the wealth contained in the state, is called the *eminent domain*." 2 Vattel, b. 1, ch. 20, § 244. He adds a qualification to this right, which has been adopted as a principle by all civilized nations. "When, in a case of necessity the society or the sovereign disposes of the possessions of a community or an individual, the alienation will be valid. But justice requires that this community or this individual be indemnified at the *public charge*; and, if the treasury is not able to bear the expense, *all* the citizens are obliged to contribute to it; for the burdens of the state ought to be supported *equally* or in a just proportion. The same rules are applicable to this case as to the loss of merchandize thrown overboard to save the vessel." Id.

These are great principles of right which lay at the foundation of civil liberty. They are a part of that imprescriptible, absolute right of property which is, as Sir William Blackstone says, "probably founded in nature;" at all events founded in reason, and without which civilization and public tranquillity could never be preserved. "So great moreover," says Sir William, "is the regard of the law for private property, that it will not authorize the least violation of it: no, not even for the general good. If a new road, for instance, were to be made through the grounds of a private person, it might, perhaps, be extensively beneficial to the public: but the law permits no man or set of men to do this without con-

sent of the owner of the land; it would be dangerous to allow any private man, or even any public tribunal to be the judge of this common good and to decide whether it be expedient or no. In this and similar cases, the legislature alone can and indeed frequently does interpose and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate for a reasonable price; and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform." (1 Bl. Com. p. 139.)

Trite and elementary as these principles are, with regard to taking private property for public use, and the duty of the public for whose use it is taken, to make just compensation; professedly, as they are wont to be assented to in all our halls of legislation and tribunals of justice, they have been more than once lost sight of in both. It is a terrible prerogative when delegated in the most careful and guarded terms and exercised in the tenderest and most delicate manner, that of taking private property at will for a real public improvement. But when conjoined to that, speculative, fanciful, and often positively injurious miscalled *improvements* are projected and their public responsible projectors, for instance, the common council of the city of New York, are armed by the legislature with a power to *take the land* of one or more individuals for opening and widening streets, and to *take the money of other individuals* who are unfortunate enough to have other lands in the vicinity, to make compensation; it becomes alarming; it should be challenged and scrutinized closely indeed, before it is allowed to gather more strength from use and prescription.

In the case of *Rogers* v. *Bradshaw*, 20 J. R. p. 105, 106, (ante p. 101) Ch. J. Spencer well expresses the general principle upon this subject of taking private property for public use. "The fifth article of the amendments to the constitution of the United States forbids the taking of private pro-

perty for public use without just compensation. The same inhibition to the power of the legislature is contained in the late amendments to the constitution of this state in 1821. I do not rely on either as having a binding constitutional force upon the act under consideration. The former related to the powers of the national government, and was intended as a restraint on that government; and the latter is not yet operative. But they are both *declaratory* of a great and fundamental principle of government; and any law violating that principle must be deemed a nullity, as it is against natural right and justice. This all important and essential principle was somewhat illustrated in the case of *The People* v. *Platt.*" (17 J. R. 215.)

These were the principles asserted and vindicated by the decision in *Bradshaw* v. *Rogers.* They were not controverted in the Court of Errors, although that court reversed the decision on other grounds. (*Ante* 101.) We may thus see at every step, that both in England and this country, the exercise of the right of eminent domain, has been jealously watched; limits have been assigned, and conditions imposed, sufficient, if duly respected, to guard against abuse and oppression. The rights of private property are now shielded from the encroachments of this sovereign prerogative, by three constitutional guaranties:

1. That the sovereign or society taking private property for any public use, shall make the owner just compensation.

2. That the compensation shall be made a charge upon the public, for whose use it is taken; or as Vattel expresses it, "that the same rules shall be applied to this case, as to the loss of merchandize thrown overboard to save the vessel."

3. That the public shall not impose upon other individuals this charge of indemnification, which properly belongs to the whole community for whose immediate use or on whose direct demand the property is taken.

Does the opinion then of Mr. Justice Beardsley on this constitutional objection keep these principles steadily in view? For, if each of them is not equally respected, in the prac-

57

tical exercise of this power, no one of them retains its value.

And first, is it true as he affirms, that by this charge on the land of the plaintiff in *Striker* v. *Kelly*, "no property of the plaintiff was taken for the use of the public?" If by property the learned judge means that no land was taken, then he certainly establishes the proposition; for the very next sentence states that the plaintiff's land does not even adjoin the avenue to be opened. But is not assessing upon an individual a round sum of money to pay for the land taken for the public use, upon some idea that he is of all others of the public to be specially benefitted by the public use to which it is to be applied, is not this taking his property? Whether you take my land for a public road, or take that of my neighbor, and assess his whole damages on my land, because the road may be an incidental benefit to mine, in either case you take my *property* for the public use.

If the state requires certain land for a *canal*, or a county requires land for a court-house, and the owners refuse to sell at a reasonable rate, the sovereign power has the right to appropriate the land to the public use it is required for; but it has never yet said in either case, to owners of adjoining property, however much it may be enhanced, "you who are individually benefitted, must, as individuals, pay for the public." Is it the private benefit or the public good which this interference with the right of private property is intended to promote? Assuredly the public benefit is the only motive and ground which can justify it. No private benefit alone can afford the slightest pretext for making a *public way* over the lands of an individual. The mode of obtaining a private right of way provided for by our statutes, and now by our constitution, where a necessity exists for one, fully recognizes and respects this principle. Is there any principle of public or municipal law, that authorizes the taking of land from one individual for public use, and taking the money of another individual or of several individuals, to pay the debt of the public for the land so taken? Is this anything more or less than saying, "We may not take A.'s land for public use without compensation; but we may make B. and C., his nearest neighbors, pay him that compensation?" Would the

property of B. and C. be any less taken for public use, than that of A. himself? Is the assumption of Mr. Justice Beardsley, then, that "no *property* of the plaintiff was taken for the public use," to be sustained upon principle? The property of every man who pays a tax to the public, is so much devoted to, and taken for the public use. But those taxes are general and not special forced contributions. And does not this constitute the sole distinction between taxation, and that taking of private property for public use, provided for in the constitution? If an individual is assessed for what the public ought to pay out of the common treasury provided by *equal* public taxes, is not the amount of his assessment, though it may, in the progress of a generation or two, be returned to him or his heirs, twenty fold, a *charge* imposed unjustly and against the spirit of the constitutional provision? Is it not paying a debt contracted by and for the public with the money of an individual?

To these questions, it is confidently believed that no jurist would hesitate to give a prompt affirmative, while the case was confined to taking the property of one individual for public use, and compelling another individual to make the compensation. It would then be pronounced a clear invasion of the right of private property; a gross violation of the letter and spirit of the constitution. In the case here put the conclusion is irresistible; there is no room for fallacy.

Then, is the principle of these assessments for *benefit*, any the less an infraction of the constitutional provision, because the contribution is levied upon twenty or one hundred owners of real estate, than if levied upon one, two or three? The actual oppressiveness is diluted, it is true, as the assessment is diffused over a larger surface; but the taint of unconstitutionality remains as long as the principle is to be traced; as long as individuals are made to pay what the public ought. When we say the *public*, we mean the *organized municipal public*, whether called by the name of town, county, city or state, for whose use it is taken. To single out certain individuals as specially chargeable with giving the public a street, which all the world has an equal right to travel, and where many, in fact, no doubt, do travel much oftener than those who are so assessed, was a bold

stroke at private property in those who framed our laws for opening streets. For to what possible public use can land be applied, which gives to the whole public, so full, so perfect an, equal right and enjoyment as a public street or road? Then should not all who thus enjoy, contribute to compensate the owner? And is there, can there be, any other equal mode of levying that contribution from all, than by the general system of taxation adopted in all other cases? It is this public use of the property which creates the obligation on the part of the public to pay for it. But no individual benefit to be derived from opening a street, by owners who happen to have lands near it, belongs of right to the public. That is as much the private property of the owner, if it really does accrue, as his lands themselves. For the benefit he derives from opening or widening a street, he ought to contribute as one of the public, in the shape of his portion of the general tax imposed for the purpose and no more: Unless, indeed, the *special charge* assessed upon his land for " benefit and advantage," as it is called, can be sustained as falling within the range of what Mr. Justice Beardsley calls " a local taxation for local purposes," (p. 24. Ante p. 231.) He says :

" This was local *taxation* for a local purpose, and falls within the legitimate exercise of the taxing power." (*Livingston* v. *The Mayor &c., of New York*, 8 Wend. 101. *Beekman* v. *The Saratoga and Schenectady Rail Road Co.*, 3 Paige, 45.) In towns, individuals are taxed to make and repair the town highways, and in cities, to grade and pave streets. " Each town has its local tax for town expenses, as has each county to meet county charges. These are all *modifications of the taxing power*, and quite as obnoxious to the constitutional objection raised, as is the *assessment of lands benefitted* by the opening of a street, to meet the charge of such an improvement."

Now, what possible point of resemblance was floating in the learned judge's mind, between these arbitrary assessments on the land of a few individuals, for benefit that may or may not be realized; and the regularly assessed, legal, general taxation of a town or county, it is impossible to conjecture. Is there any, the slightest respect, in which the

cases are alike? The expense of opening new roads in towns, is borne by all the taxable inhabitants of the town; it is raised by the same system of general, equal taxation, as all other sums for the town expenses. Nobody ever heard of commissioners of highways in towns on opening a road, assessing any particular land owners for *special benefit !* The statute does not give them the power, and if it did, such a "modification of the taxing power," would be as obnoxious to the constitutional objection, as the arbitrary special assessment for benefit, in the city of New York. There is therefore no more countenance or support to be derived from the fact, that towns are empowered to lay a general tax for town purposes, than from the fact that the state also imposes general state taxes for state purposes.

How then, can this proposition be sustained, that it is *local taxation* for a local purpose? That it is entitled to be called a *tax* in any legal sense of the term? Not only upon principle, but upon authority also, is it impossible to bring those assessments within any definition or idea of a *tax.* This point was expressly adjudicated in *The Matter of the Corporation of New York, in re improving Nassau Street,* 11 J. R. 77. The church *Du St. Esprit,* in Pine Street; the Presbyterian church in Wall street; and the Scotch church in Cedar street had been assessed for the widening of Nassau street: the first, $1273; the second, $1981, and the third, $410. The churches opposed the confirmation of the report on the ground that they were exempted from such assessment under the statute provision that "no church or place of public worship should be *taxed* by any law of this state." But the court held that their claim to total exemption was not well founded; that the statute referred only to general and public taxes, to be assessed and collected for the benefit of the town, country, or state *at large.* The court say: "The word *taxes,* means burdens, charges, or impositions, put or set upon property for public uses: and this is the definition Lord Coke gives of the word "*talliage ;*" (2 Inst. 532.) and Lord Holt in Carth. 438, gives the same definition in substance of the word *tax.* But to pay for the opening of a street in a *ratio* to the benefit and advantage derived, is no *burden.* And they cited the maxim: "*qui*

*sentit commodum sentire debet et onus.* The maxim is an ancient and a goodly one; but if the learned and able judges who cited it had stopped to enquire for an instant, *whose* was the *commodum*, they would have found that the *onus* legally belonged in a very different quarter. The court did not advert to the use which the public have of the land taken for a street, and that the corporators of these churches had no more right to the enjoyment of the easement, or, in other words, the *commodum*, than any other portion of the public. The public benefit is entirely lost sight of in this arbitrary system of assessing benefit upon individuals. It was a cunning as well as a bold system of appropriating private property to the public use, when it was first established. As the late Mr. Van Vechten, in his argument in *Beekman* v. *The Saratoga and Schenectady R. R. Co.*, 3 Paige 51, expressed it: "In 1807, this *great system of embellishing* the city of New York was first *invented.*" But bold as it was in its first invention, its practical administration since has been yet more reckless; the levity, and wantonness, and abuses in its execution have been the natural and inevitable consequences of the utter disregard of the constitutional rights of private property in its origin. These so called "*improvements,*" have, in almost every case, been wholly effected by heavy assessments on individuals to pay for what the public enjoys. In many instances, they have been a series of experiments to raise the speculative price of unimproved lots: in others, to answer some private purpose, of even more questionable character. But we cited the case from 11 J. R., only for the purpose of showing that these assessments for *benefit* cannot be sustained as a *tax* in any sense of the word. The Supreme Court, on the contrary, very frankly put it upon the express ground, that the *public* have a right to relieve themselves from paying for a street or road, by appropriating to themselves all the incidental benefit and advantage which a few individuals may possibly derive from its opening. In other words, putting those few persons into their own place and compelling them to bear all the burden which by the constitution is imposed upon themselves.

Now, if this system cannot be sustained as a *tax* for a local purpose, is there any other power to be found in the cases

cited by Mr. Justice Beardsley, in virtue of which it may be upheld? The case of *Livingston* v. *The Mayor, &c. of N. Y.*, was that of an owner who, for several years had been selling lots *bounded on a street* laid out in the plan of the city, but not actually opened, as in the case of *Graham* v. *Murray*, (ante p. 439.) The street being opened, and his damages having been assessed at a mere *nominal* sum, he now opposed the confirmation of the report. Several questions were made in the case ; but the only one material to our present purpose, was the ground insisted on by the owner that the increased value of adjacent property belonging to him could not be set off against the property actually taken.

The Chancellor discusses this objection in the following paragraph :

" It is not denied that the legislature have the power to authorize the taking of private property for the purpose of public streets, upon making just compensation to the owners : but the plaintiff's counsel insist that the increased value of adjacent property belonging to the same individual cannot be set off against the loss or damage sustained by him in taking his property for a street, and be considered as a just compensation for the property so taken. The owner of the property taken is entitled to a full compensation for the *damage* he sustains thereby, but if the taking of his property for the public improvement is a benefit rather than an injury to him, he certainly has no equitable claim to damages. Besides, it is a well settled principle, that where any particular county, district, or *neighborhood* is exclusively benefitted by a *public improvement*, the inhabitants of that district may be taxed for the whole expenses of the improvement, and in proportion to the *supposed* benefit to each. In this case, if the whole value of the property taken for a street in the city of New York is allowed to the individual owner, the proprietors of the adjacent lots must be assessed for the purpose of paying that amount, and if the individual whose property is taken, is the owner of a lot adjacent, that lot must be assessed rateably with the others. It therefore makes no difference whether he is allowed the whole value of the property taken in the first instance, and is assessed for his portion of the *damage !* or whether the one sum is off-set against the other in the first place, and the balance only is allowed."

"Assessed for his portion of the damage!" Can anything show the absurdity and the enormity of the whole system more strongly than this? The party is to be assessed for his *portion of the damages* sustained by himself, in taking his land for the public use! To pay the owner for his land, you charge all the land he owns, in the "neighborhood," as the Chancellor expresses it, with the damages he has sustained! Is this making just compensation? What, again and again we ask, has the public that takes the land for a street, to do with the "benefit," that individuals may incidentally derive from it, by means of other property? But, says the Chancellor, "if the taking of his property for the public improvement is a benefit rather than an injury to him, he certainly has no equitable claim to damages." Indeed! Then the equitable consequence is, that if the owner's benefit, greatly exceeds the land taken, he has no equitable claim to such excess of benefit; and it belongs equitably to the public, which has done him the favor of taking his property! For, *the same reasoning which would establish the right of the public to any part, would give them a full equitable claim to the whole*, and he ought to refund to the public. Thus, an owner who had lost five lots worth $5,000, by being taken for a street, if he happened to own fifty others adjacent, may be, and sometimes actually has been assessed $10,000 for benefit, and thus compelled to pay $5,000 for the *privilege* of having his five lots taken and occupied by the public. The public, the only occupant, goes entirely scot-free, and makes him not the slightest compensation for its perpetual enjoyment of his land!

Thus far the Chancellor's opinion in the case of *Livingston*, is but a repetition of the idea of the Supreme Court, in 11 John. 77; that "*qui sentit commodum, sentire debet et onus:*" but the "*commodum*" of the public in the use of the street, seems to have no more occurred to him, than to the Supreme Court.

But there is a fallacy in the very statement of the question, by the Chancellor, which must not be allowed to pass without exposition.

He says: "The owner of the property taken is entitled to a full compensation for the damages he sustains thereby;

but if a benefit rather than an injury accrues to him, he certainly has no claim to damages." This is not the language nor the spirit of the constitutional provision. That ordains that you shall pay for the *property taken :* it says nothing of *damages* or *benefit ;* nor that you may take the property and leave the owner to indemnify himself if he can, by the benefits which may eventually accrue to him, his heirs or assigns. The very terms of the Chancellor's premises, then, are erroneous ; the true proposition is ; the owner of the property taken, is entitled to a compensation equal to the value of it. That is the broad *fiat* of the constitution ; and it leaves no room for speculating upon probable or possible benefit that may incidentally accrue to the other property of the owner. If the constitution had said "damages over and above his probable or posssible benefit," then the Chancellor's statement of the question would have been correct. But no such loose, uncertain and arbitrary rule, is to be found in the constitution. That provides that you shall pay for what you take ; not in visions and pictures of future and possible enhancement of the value of other land, but in the same current coin an individual purchaser would pay for it. For, after all, as Sir William Blackstone says : "The public is now considered as an individual treating with an individual for an exchange." It is the public that purchases for its own use ; not for the use or advantage of a few individuals owning land near the street to be opened. It is the public acting for itself, and not as the self appointed agent of other land owners of the vicinage.

We come, then, to the other ground upon which the Chancellor in the case under consideration, rests the constitutionality of these assessments for benefit. He now departs from the mere equitable ground of the Supreme Court in 11 J. R. 77, "*qui sentit commodum,*" &c., and attempts to eke out the power, under the color of a tax, for a *public improvement,* for the *exclusive benefit* of a particular neighborhood. These are his words upon this part of the subject : "Besides, it is a well settled principle, that where any particular county, district, or neighborhood, is exclusively benefitted by a public improvement, the inhabitants of that district may be

taxed for the whole expenses of the improvement, and in proportion to the supposed benefit to each." Now what " public improvement," can the Chancellor point out for the exclusive benefit of any county, town, or district, which is ever paid for otherwise than by a regular county, town, or district tax, levied without regard to the supposed benefit to each? There is no law, no statute, authorizing any such arbitrary levies of taxes upon individuals, " in proportion to the supposed benefit of each ;" except these laws for assessing " benefits," in New York and some other cities. The smallest municipal " districts," authorized by law, road districts for the repair of highways, have no such feature of taxation. The tax is general and equal as for other public purposes, and no inquiry is authorized by the statute as to the proportion of supposed benefit to each, as a rule in assessing the taxable inhabitants. But what shall we say of this proposition, as applicable to the case before the Chancellor, when we find him assuming that the street in question is opened for the *exclusive benefit* of the parties who owned lands in the neighborhood? That therefore to lay a tax on that neighborhood, to pay for it, is a well settled principle? It is a mere repetition of foregone conclusions, to say, on the other hand, that the public at large are the parties exclusively benefitted by a public street; and that the owners of the land in its vicinity are only benefitted by the use of it in proportion to their numbers, compared with those of the public at large. But whence is this so well settled principle of taxing a neighborhood derived? We have all heard of state, county, town, and city taxes : but who ever heard of a neighborhood *tax* before? Who is to assess, who to levy it, for what purposes, and who is responsible for the application of it? But let us deal fairly with this proposition of the Chancellor, in regard to taxing neighborhoods. He only lays it down as a well settled *principle ;* he does not affirm it to be a well settled *practice.* Now it can not be denied that in point of principle, or rather of departure from principle, there has been one instance of legislation in our state, similar to that of compelling a few individuals in the city of New York, to pay for the land taken for public streets, upon the plea of incidental benefit. But

long before the measure could be practically carried into effect, it was condemned and abandoned.

By the act of April 15, 1817, (S. Laws of 1817, p. 302,) which was the fundamental law for the construction of the Erie and Champlain canals, the legislature, then casting about for ways and means to execute a vast design, did incorporate a section in that act, (§ 7, 305,) imposing a tax of $250,000 for the benefit of the canal fund, upon the lands lying on each side of the canal, within 25 miles of its route. This section provided that "it shall be the duty of the canal commissioners to raise the sum of $250,000, for the canal fund, by causing that sum to be assessed and levied, in such manner as the said commissioners may determine and direct, upon the lands and real estate lying along the route of the canal, within 25 miles on each side ; to be levied and assessed in such proportion for each, as the said commissioners shall determine ; to be raised, either by sale or otherwise, as they shall deem meet ; and the assessment shall be made on said lands, according to the benefit which they shall be considered by the said commissioners as deriving from the making of the said canals respectively ;" it also provided that the rules, &c., for that purpose of collecting, &c., should be sanctioned by the Chancellor and judges of the Supreme Court, or a majority of them ; and that any subscription of money or other property toward the completion of the canals, by any proprietor of such lands, should be deducted from his tax or assessment.

This section was by an act passed the 7th day of April, 1819, in fact repealed, though in form, only "*suspended* until the further order of the legislature thereon." In March, 1820, the then canal commissioners, Dewitt Clinton, Stephen Van Rensselaer and Myron Holley, made an able and elaborate report, upon the general subject of the canals, and particularly, upon the financial measures already, and to be further adopted, to ensure their completion. In this report, the tax or assessment in question, without it is true, raising any constitutional objection to it, was fully discussed ; and upon considerations of its inequality, inconvenience, and oppressiveness, if not impracticability, it was condemned without reserve. (See 2 vol. Canal Laws, 458–462, published under

authority of the legislature, in 1825.)    The report after point-
ing out these features, says : " The inconvenience of this mode
of raising money would soon be apparent to everybody, and
it would become justly odious."    Again, " The inconvenience
and expense of collecting such a tax, afford very strong reasons
against the expediency of it."    This report gave the death-
blow to this contemplated system of neighborhood taxation.
And who will not admit, most justly ?    The legislature and
the state at large, had begun to comprehend that these great
avenues of commerce and intercourse were not neighbor-
hood improvements, but were to be vast state and even na-
tional channels of intercommunion, not only for all those
who might traverse them during the present and future
generations, but for the benefit of all those who might re-
ceive through them the accumulated products of the wide
extended regions which were beckoned to their embrace.
But if the principle of this taxation of the land within
25 miles of the canal were sustainable, what was there to
prevent the legislature from imposing the whole expense of
this noble work upon the owners of those lands ?    It would
have been no violent, but a very reasonable assumption, that
they would be benefitted not merely to the amount of the
$6,000,000, at which the cost of the Erie canal was esti-
mated, but thrice and four times that amount.    They have
reaped advantages almost incalculable ; those of them who
have lived perchance, to enjoy them.    But what a monstrous
act of oppression, of arbitrary and unconstitutional exaction,
if the whole expense of these public improvements, had
been levied upon their lands on the pretence of *exclusive*
benefit.    And yet that would have been, according to Chan-
cellor Walworth's " well settled principle" of taxation, a
mere *tax* imposed upon the neighborhood, which was " ex-
clusively benefitted by that public improvement."    For so
the owners of land adjacent to the canal might as well be
considered as the owners of lots in the neighborhood of
a street to be dedicated to the public.    The fallacy of this
lies in the very statement of the question.    The public obli-
gation to pay, is co-extensive with its power to take.    It
takes for its own use and benefit; and it has no right to in-
dulge in any speculation as to other benefits than its own.
It has no right to ask the owner of property thus taken,

whether he " has not other land in the neighborhood?" He might well reply to such a question, " take my land, since you have the power; but pay for what you take, and depart in peace."

The Chancellor refers in the case of *Livingston* v. *The Mayor*, &c., to the other case cited by Mr. Justice Beardsley on this subject of taxation. The Chancellor says: "I have recently had occasion to examine this question as well as that of the right of a party to a jury to assess his damages, in the case of *Beekman* v. *The Saratoga and Schenectady R. R. Co.*, not yet reported." This is the case cited by Mr. Justice Beardsley, as an authority to establish his proposition, that assessments for benefit are but a " local tax for local purposes." But in the case itself, the question did not arise; nor was it discussed at all by the Chancellor. We find nothing in his opinion that has the slightest bearing on that subject; nothing which countenances the idea which he put forth in the case of *Livingston* v. *The Mayor*, &c., that you have a right to take the land of an individual for public use, and pay him for it with some other land he may own in the neighborhood. For, paying him in that currency, is paying him in effect with the land to which the benefit is supposed to accrue.

Then, as to the property of other owners in the vicinity of a new street, about to be opened, can anything have a more direct tendency to depress the market value of their lots, if they are on sale, than this new creation of so many rival lots, to be brought into direct competition with their own, the moment the street is to be opened? The parties most certain to be immediately injured in their sales, are by this system selected to contribute for the pretended benefit! They are, in many cases the real losers, without reference to their assessments; they are then made to pay all for the street, while the only party benefitted, the public, pays nothing. *That* gives itself no trouble to inquire whether the speculative benefit assessed upon the " neighbors," is ever realized or not; still less, in their searches after victims of incidental benefit, do the assessors ever turn aside to ask for the sufferers by these incidental injuries. A system so evidently arbitrary, unequal and unjust, even if its constitutionality were less doubtful, ought not to be permitted a

longer existence. It does not comport with the first princi-
ples of taxation; it violates them all in taxing individuals
upon future possible benefit, as a basis of taxation; its prac-
tical benefits are few and uncertain; its abuses, manifold
and inevitable.

It cannot be claimed that the act for laying the tax of
$250,000 upon the lands within 25 miles on each side of the
canals, adds any force or sanction to the principle it embraced.
It was immediately abandoned, never to be revived. So far
as principle and practice are concerned, this system of as-
sessing benefits upon neighboring owners, stands only upon
its own pretensions, as to principle and precedent. If the
former is wanting, on the ground of constitutionality, prece-
dents and prescription are not yet sufficient to maintain it.
The question, in fact, in this shape, was not presented to the
Supreme Court in the case of *Striker* v. *Kelly;* and if it
had been, as that case was reversed in the Court of Errors,
though on other grounds, the subject is still open for exam-
ination in the court of dernier resort. The question in the
case of *Livingston* v. *The Mayor, &c. of N. Y.*, was essen-
tially different. The owner whose property was taken, and
who had been paid in benefits to other lots, insisted that he
was entitled to compensation for what was taken without re-
gard to the suppositious benefits. This rule the Chancellor
certainly dissents from, as we have seen : and though on the
ground of " neighborhood" taxation his opinion contains no-
thing to support his views, yet it must be frankly admitted
that the legislature, in the canal act of April, 1817, before al-
luded to, has prescribed a mode of assessing compensation
to owners of lands, taken for canal purposes, which in this
respect is liable to the same objection as that which was com-
plained of in the case of *Livingston* v. *The Mayor, &c.*
By the third section of that act, it was provided, that, " for
all *lands, waters, and streams* taken for the purposes of the
canals, it shall be the duty of the canal appraisers, or a ma-
jority of them to make a just and equitable assessment and
appraisal of the *loss* and *damage,* if any, *over and above
the benefit and advantage* to the respective owners or pro-
prietors, or parties interested in the premises so required.
(This provision is re-enacted in 2 R. S. 211, § 50, 2d ed.)

No question, as to the constitutional propriety of this mode of ascertaining the compensation for property taken under this act, appears to have been agitated before our tribunals. Probably both the liberality of the canal appraisers to owners, and the deep interest taken by the latter in so great and beneficial a public work, have led to this acquiescence. But in a recent case, a question arose which appears to have some bearing on the constitutional principles which ought to govern in ascertaining as well as paying the compensation. In the case of *The People ex rel. Utley* v. *Hayden and others, Canal Appraisers*, 6 Hill, 359, a motion was made for a mandamus against Hayden and others, canal appraisers. A section of the Black River Canal crossed the farm of the relator, in Oneida County, and that portion of it was nearly finished when the work was suspended. In May, 1843, he presented a claim for damages to the canal appraisers, amounting to more than $2000; but they declined to act upon it, assigning as a reason that doubts were entertained of their jurisdiction. It was insisted on the part of the canal appraisers, that no appropriation of the land of the relator takes place, within the meaning of the statute, until the work on the canal is finished; and that until that period no appraisement and payment of his damages could be required. The relator contended, on the other hand, that as the state had fixed upon the route, and taken permanent and exclusive possession of the lands and commenced the execution of the work, the appropriation had taken place, and the canal appraisers had jurisdiction to proceed in assessing his damages, &c.

Nelson, Ch. J. in delivering the opinion of the court says:

" The only question is, whether the facts before us disclose a case of such an appropriation. If they do, the appraisers should go on and discharge their duty; and if they refuse, a *mandamus* is the appropriate remedy."

" Although it may not be necessary, within the constitutional provision, that the amount of compensation should be actually ascertained and paid before property is thus taken, it is, I apprehend, the settled doctrine, even as it respects the state itself, that at least, certain and ample provision must first be made by law (except in cases of public emergency) so that the owner can coerce payment through the judicial

tribunals or otherwise, *without* any unreasonable or unnecessary delay. Otherwise the law making the appropriation is no better than blank paper. (*Bloodgood* v. *The Mohawk & Hudson R. R. Co.*, 18 Wend. 9.)

"The statute places the right to have compensation made where the principle of the constitution places it, viz: upon the forcible divestment of the use and enjoyment of private property for the public benefit; and not as contended in behalf of the people, upon the completion of the public work for which it is taken. The latter is a question in which the individual has no special interest, depending upon the will or wisdom of the legislature, and all the considerations which usually enter into and influence legislative action. The work may be completed in one, two, or more years, or it may never be completed."

"The *statute* before us places the right to compensation upon no such contingent and fluctuating basis. When the public agents have entered upon and taken possession of the property in the manner contemplated by the statute, (1 R. S. 206, § 16, 2d. ed.) *the event has happened which entitles the* owner to an appraisement of his damages. Though the work should never be completed, it is all the same to the owner; except that he may thus be deprived of the *benefits* which the appraisers are required to *deduct* from the *damages* sustained. But that, perhaps, is a *wrong* without *a remedy.*" Mandamus accordingly.*

Now, if the learned Ch. Justice, when he had arrived at this conclusion, had but looked beyond the statute before him, so far as to the constitutional provision on this subject of compensation to the owner, he would have discovered that the "wrong" which he deplores as one remediless, was susceptible of a very plain and easy remedy, by merely adhering to the language of the constitution. That declares as explicitly as words can express it, that for private property taken for public use, the owner shall receive a just compensation. Ch. J. Nelson himself holds it to be "the settled doctrine, even as it respects the state itself that at least *certain* and

---

* In *Baker* v. *Johnson*, 2 Hill, 342, the Supreme Court held that " no formal resolution of the canal commissioners to take the land was necessary. Entering on the land and laying out and commencing the work amounted to a sufficient appropriation; although the absolute fee did not pass to the state until the appraisement of the damages." p. 347.

ample provision must first be made by law (except in cases of public emergency) so that the owner can coerce payment of the amount of his compensation, through the judicial tribunals or otherwise, without any *unreasonable* or *unnecessary* delay." But when you make the owner's compensation depend upon *benefits* estimated of which he may be deprived, not only by the non-completion of the work, but by a thousand other unforseen contingencies, how can it be said that "*certain* or *ample* provision is made by law so that the owner can coerce payment?" How is he to *coerce* payment by the judicial tribunals or otherwise of the amount of benefits thus deducted from the fair value of his lands? Where is he to get this prospective addition to the price of his other lands, discounted for something certain and tangible? Where is the mint in which these golden promises of future profit can be stamped with current value? The state has provided none; it offers no guaranty that the estimates of benefits made by its canal appraisers shall be realized in one, ten, or twenty years. Therefore, as Ch. Justice Nelson says of the statute, so say we of the constitution : "It places the right to compensation upon no such contingent and fluctuating basis." It has made no such currency a legal tender for property taken for public use.

But this rule of estimating benefits from the land, against the damages of the owner, is comparatively harmless, in itself; at all events, no complaints have been heard before our legal tribunals of its practical operation. It may be because it has been essentially disregarded in awarding the compensation for lands taken for canal purposes. In principle, it seems to be liable to the constitutional objection, pointed out, if that be well founded. But even in point of principle, it falls so far short of the system of arbitrary exactions, carried on in the city of New York, under the name and pretence of assessments for benefits, that it can scarcely be placed in the same category. The power delegated to the common council by that system is nothing less in practice than the absolute right of *eminent domain*. It might admit of great doubt, how far such a delegation of that power by the legislature, is consistent with the first princi-

59

ples of constitutional legislation. But if it have the right to delegate that prerogative, it has no right to confer a power which itself does not possess; that of taking private property for public use without just compensation by the public to the owner. The return to that true constitutional ground of itself, would erect a firm barrier against that flood of waste, injustice, and oppression, which from the first origin of the system, has swept in turn over nearly every portion of our city. The decision in the case of *Striker* v. *Kelly*, it was thought, would have some good tendency toward the protection of the rights of private property against it. But it was a temporary check only, if at all; and the tide is again returning with renewed force. The common council is again as busy as ever in searching for new objects on which to shower its benefits. So impatient is their zeal to do good *in invitos*, that they could not even wait for the passage of a law to confer the power of appointing commissioners of estimate and assessment on some other tribunal than the Supreme Court; although the new constitution has expressly prohibited its judges from " exercising any power of appointment to public office." (Art. VI. Sec. 8.) The city councils have taken the grave responsibility of going on with proceedings to open new streets and avenues, and applying to have commissioners appointed by the Supreme Court, as if no such constitutional prohibition existed. They are running the imminent hazard of having those appointments and all the wastefully expensive proceedings consequent upon them, at no very remote period, declared *coram non judice;* utterly null and void. If those commissioners are not public officers, what are they? If such an employment is not as Chief Justice Marshall* has judicially sanc-

---

* See the case of *The United States* v. *Maurice and al.* 2 Brockbrough's Rep. 96, where Chief Justice Marshall held, that an *agent of fortifications* was an *officer* of the United States and must be appointed by the President and Senate, and that an appointment by the Secretary of War was a mere nullity. He there says, " Is the agent of fortifications an officer of the United States. An office is defined to be a " public charge or employment," and he who performs the duties of the office is an officer. If employed on the

tioned the definition of an office, "a public charge or employment," what else is it, and what is its name? This is a constitutional objection that might easily have been obviated by vesting the power in the New York Superior Court, or in the Common Pleas. But, as if to multiply designedly constitutional objections to their proceedings, the councils have not, it would appear, deemed it of sufficient importance to occupy their wisdom. Perhaps, however, they have a right to indulgence, as such subjects are, to be sure, quite foreign to their studies and pursuits.

Nor, perhaps, ought the general subject of these assessments for benefit to be pressed upon their overtasked understandings, with a view to the correction of its abuses; still less, to its annihilation, as radically and fundamentally unconstitutional. For redress against the system on that ground, it is in vain to look elsewhere than to the legal tribunals whose duty as well as prerogative, it is to uphold, at whatever cost to public bodies or to individuals, the constitutional guarantees of the rights of private property. It is as dangerous to prophesy results of judicial deliberations upon questions of constitutional interpretation, as upon any other subject of forensic debate. But whenever this question shall be presented to the court of dernier resort, there can be no room to doubt that it will there receive the most deliberate attention and investigation in all its extent; and that no considerations of expediency or of mere inconvenience to

---

part of the U. S., he is an officer of the United States. Although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed under a contract express or implied, to do an act, or perform a service, without becoming an officer. But if a duty be a continuing one, which is defined by rules, prescribed by the government; and not by contract, which an individual is appointed by government to perform, who enters on the duties appertaining to his station without any contract defining them; if those duties continue though the person be changed, it seems very difficult to distinguish such a charge or employment, from an office, or the person who performs the duties from an officer." 2 Brock. R. 103.

Tested by this definition, commissioners of estimate and assessments are clearly such " public officers," as the Supreme Court are prohibited from exercising any power of appointing by the clause of the constitution of 1846, cited above.

our municipality, will prevent that high tribunal from over-throwing the whole system if found to be in derogation of the constitutional provision, and the rights of the citizen.